## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMON CHARLES PHETSACKSITH,<br><br>Defendant. | Case No. 25-CR-00174-SEH |

## <u>OPINION AND ORDER</u>

Before the Court is Defendant Jamon Phetsacksith's objection to the government's notice of intent to offer expert testimony from Lori Gonzalez [ECF No. 36] and his motion to suppress statements [ECF No. 39]. For the reasons provided below, the objection is overruled, in part, and sustained, in part. It is overruled as to the reliability of Ms. Gonzalez's testimony and sustained as to limiting her expert testimony to opinions relevant to the facts of this case. As to the motion to suppress, although arresting officers did not *Mirandize* Phetsacksith, the statements he made to officers before he was in custody and the spontaneous statements he made while in custody are admissible. Therefore, the Court grants, in part, and denies, in part, the motion to suppress.

## I. Background/Procedural History

On November 29, 2024, Phetsacksith called 911 from a warehouse in Tulsa, reporting that his girlfriend, R.F., had fallen down a flight of stairs while intoxicated.[1] Paramedics arrived and began rendering aid. At first, R.F. corroborated Phetsacksith's description of events, but then recanted once separated from him. Following R.F.'s disclosure, the paramedics contacted dispatch and requested help from the Tulsa Police Department.

Shortly after 9:00 p.m., TPD Officers Matthew Shipman and Patrick Garner arrived at the scene. Shipman spoke to R.F. and the paramedics inside an ambulance while Garner spoke to Phetsacksith in the warehouse parking lot. The paramedics explained to Shipman that they had treated R.F. for an obvious leg deformity and administered pain medication. They further noted that R.F. had initially claimed she fell down a flight of stairs but recanted once inside the ambulance. R.F. told Shipman that she was attempting to walk away from Phetsacksith when he repeatedly knocked her down and eventually broke her leg. The paramedics explained that Phetsacksith wanted to follow the ambulance to the hospital, but R.F. did not want him there and wanted to make a report. R.F. further disclosed that,

---

[1] The Court derives the background facts from Phetsacksith's motion to suppress [ECF No. 39], the government's response [ECF No. 44], and the body camera footage attached to each.

over the course of her six-month relationship with Phetsacksith, he had bitten her, pushed her down, kept her in a car, and got very angry when she tried to walk away from him.

While Shipman spoke to R.F., Garner approached Phetsacksith and asked him what was going on. As Garner approached, Phetsacksith leaned against a small trailer attached to the back of his SUV with his hands in his pockets. Phetsacksith said they had been drinking and that R.F. had fallen down the stairs. When Garner asked whether Phetsacksith had any weapons in his car or on him, Phetsacksith replied that there was a revolver in the backseat. Garner told Phetsacksith that he would take it "just for the nature of it" and retrieved the firearm from the backseat of Phetsacksith's SUV. As Garner retrieved it, he told Phetsacksith to "remind" him to give it back to him when they were "done." Garner placed the revolver in his patrol SUV.

After this exchange, Garner asked Phetsacksith whether he and R.F. had been in a fight before that evening. Phetsacksith said, "Yeah, we have." When Garner asked what the argument was over that night, Phetsacksith said, "Tonight, it was just … it's always stupid stuff," and admitted that they both had "too much to drink." Garner told Phetsacksith, "Hang tight for me real quick" and joined Shipman in the ambulance for a few minutes, leaving Phetsacksith alone in the parking lot. After both officers stepped out of the ambulance, Shipman asked Phetsacksith what happened. Phetsacksith said

"I'm just going to be honest with you man, we just, we got drunk, and we just had a fight, and it got out of hand." Phetsacksith explained "there was pushing, there was shoving, she was pulling my hair, I mean, but I didn't mean [for] that to happen." Shipman then placed Phetsacksith in handcuffs.

A few minutes later, Shipman engaged Phetsacksith again by saying "So, you said you guys were drinking, arguing, things got a little out of hand, so …." Phetsacksith responded that he "just threw her to the ground …" but that he did not know how R.F. broke her leg. Shipman further asked about the location of the assault, how long Phetsacksith and R.F. had been together, and whether Phetsacksith was Native American. Phetsacksith answered these questions, responding that he was Osage. Later, Phetsacksith spontaneously said, "Yeah, as soon as that guy said he was waiting on something to take her there I just thought you guys. It probably would've been worse if I'd have ran off or something … I just didn't want you guys like chasing after me, not like literally, but like finding me."

Garner moved Phetsacksith's SUV to the back of the warehouse parking lot and locked it, placing the firearm back inside. At no time did the officers advise Phetsacksith of his *Miranda* rights.

A federal grand jury charged Phetsacksith with one count of assault resulting in serious bodily injury in Indian Country. [ECF No. 2]. Jury trial is currently scheduled for January 5, 2026. [ECF No. 35]. The government

4

provided notice that it intends to introduce testimony of domestic violence expert Lori Gonzalez. [ECF No. 15]. The notice provides Ms. Gonzalez's curriculum vitae, a summary of her professional development, and her experience testifying in state and federal courts. [ECF No. 15-2]. It further provides that Ms. Gonzalez will testify as a "blind" expert and offer opinions about domestic violence victims staying with their abusers, trauma bonding, children exposed to violence between adults, victim reluctance to fight back or contact police, a cycle of violence, and the "Power and Control Wheel." [ECF No. 15-1]. Phetsacksith objects to this testimony on reliability and relevance grounds and argues that it is unfairly prejudicial. [ECF No. 36].

Phetsacksith also moves to suppress statements he made to Shipman and Garner the night of his arrest. [ECF Nos. 36, 39].

## II. Analysis

### A. Ms. Gonzalez's expert testimony is limited to opinions relevant to the facts of this case.

Admissibility of expert witness testimony is evaluated under Fed. R. Evid. 702, which permits a qualified expert to testify and render an opinion when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and "it is more likely than not that:"

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles or methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Pursuant to Rule 702, the Court must perform a "gatekeeping role ... of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The objective of this "gatekeeping requirement ... is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "When an objection to an expert's testimony is raised, the court must perform *Daubert* gatekeeper duties before the jury is permitted to hear the evidence." *Bright v. Ohio Nat's Life Assur. Corp.*, 11-CV-475-GKF, 2013 WL 12327512, at *1 (N.D. Okla. Jan. 9, 2013) (citing *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. at 149).

In exercising its gatekeeper duties, a district court must undertake a two-step analysis. *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th

Cir. 2009) (en banc)). "First, the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *Id.* (cleaned up). "If so qualified, the Court must then determine whether the expert's opinion is reliable under the principles set forth in *Daubert* and *Kumho Tire* and relevant, in that it will assist the trier of fact." *Lippe v. Howard*, 287 F. Supp. 3d 1271, 1278 (W.D. Okla. 2008). The party offering the expert testimony has the burden to prove that the expert is qualified and that her opinions are based in sound methodology and sufficient facts. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

"[A] judge assessing a proffer of expert … testimony under Rule 702 should also be mindful of other applicable rules," including Fed. R. Evid. 403. *Daubert*, 509 U.S. at 595. Rule 403 permits the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice …." Fed. R. Evid. 403. The Tenth Circuit has described evidence as being unfairly prejudicial when "it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Rodriguez*, 192 F.3d 946, 951 (10th Cir. 1999).

Here, Phetsacksith objects to any reference of Ms. Gonzalez's experience as a sexual assault counselor and "any testimony premised on how

individuals behave after experiencing a pattern of domestic violence." [ECF No. 36 at 6–7]. He argues that this evidence is not relevant because this case does not involve sexual violence and, without admission of alleged other acts, does not involve a pattern of domestic abuse.[2] [*Id.*]. He further claims that Ms. Gonzelez's testimony about domestic abuse victims recanting allegations "impermissibly encroaches on the credibility of R.F." [*Id.* at 8–9]. Phetsacksith requests that the Court wholly exclude Ms. Gonzalez's testimony, limit it to behaviors R.F. exhibited, or, alternatively, hold a *Daubert* hearing. [*Id.* at 7–8, 12].

The government responds that Ms. Gonzalez's testimony is relevant and reliable and will help the jury understand the complexities of domestic violence relationships and counter-intuitive victim behavior. [ECF No. 43 at 6]. The government further states that Ms. Gonzalez will not vouch for the victim's credibility because she will not opine that the victim experienced abuse. [ECF No. 43 at 12].

As an initial matter, the Court will not hold a hearing before ruling on Phetsacksith's objection. *Daubert* does not mandate an evidentiary hearing and this case does not involve any new scientific theory or novel methodology.

---

[2] Phetsacksith's objection references another notice the government provided of its intent to offer evidence pursuant to Rule 404(b). [ECF No. 16]. The Court has not yet ruled on his pending objection [ECF No. 37].

*See United States v. Nichols*, 169 F.3d 1255, 1262–63 (10th Cir. 1999) (finding no abuse of discretion when district court declined to hold an evidentiary hearing on a *Daubert* challenge).

Although Phetsacksith does not challenge Ms. Gonzalez's qualifications to testify as a domestic violence expert, the Court will perform the first step of its gatekeeper duties and find her qualified. The notice provides that Ms. Gonzalez holds a bachelor of science degree in psychology, a master's degree in counseling psychology, has counseled thousands of domestic violence victims, and has received more than 1,000 hours of domestic violence training. [ECF No. 15 at 2; ECF No. 15-2]. Nonetheless, because her experience working with sexual violence victims is not relevant to the facts of this case, the government is directed not to ask Ms. Gonzalez about her experience in that area.

Ms. Gonzalez's testimony is also reliable and will help the jury understand the evidence in this case. *Daubert* provided factors for courts to consider when deciding whether expert testimony is reliable:

> (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has 'general acceptance.'

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (citing *Daubert*, 509 U.S. at 593–94).

Whether courts have accepted a methodology is also relevant in determining the reliability of expert testimony. *See Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780–81 (10th Cir. 2009) (collecting cases familiar with and accepting a certain type of methodology in considering expert witness testimony). But "this list is neither definitive nor exhaustive" and courts have "wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability." *Bitler*, 400 F.3d at 1233 (citing *Kumho Tire*, 526 U.S. at 150). "Thus, it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant." *Id.* at 1234.

Here, the government provides ample case law demonstrating that courts consistently find expert testimony about domestic violence issues reliable, including the "cycle of violence" and "Power and Control Wheel." Ms. Gonzalez's proffered testimony is based on her extensive personal experience counseling victims of domestic abuse, and she has qualified as an expert in both state and federal courts. The Court finds this sufficient to show that her testimony is reliable.

Phetsacksith argues that Ms. Gonzalez's testimony is not relevant if the Court does not admit evidence of prior domestic abuse. The Court disagrees. The body camera footage in the record shows that R.F. recanted her initial

10

explanation for her injuries, acknowledged to Shipman that Phetsacksith had

assaulted her on other occasions over the course of their six-month

relationship, and described Phetsacksith as "a control freak." Phetsacksith

admitted to Garner that he and R.F. had fought before that evening and said,

this time, things "got out of hand." Phetsacksith and R.F. also each explained

that they had known one another for years before they started dating.

Therefore, expert testimony about staying with an abuser in a domestic

violence relationship, the cycle of violence, and the Power and Control Wheel

is relevant to the facts at hand and will help the jury understand the

evidence.

But Ms. Gonzalez's proffered testimony is much broader than the facts

presented. The government concedes that the impact violence has on children

is not at issue in this case. [ECF No. 43 at 4 n.1]. And the Court is unaware of

any evidence that R.F. did not fight back or was reluctant to contact the

police. The government has also not presented sufficient facts to show trauma

bonding between R.F. and Phetsacksith. Ms. Gonzalez's expert testimony is

only helpful to the jury insofar as it is relevant to the conduct at issue and is

not confusing or misleading. Accordingly, she may not testify about "typical

behaviors of an abuser and/or victim that have no bearing on the facts at

issue in this case." *See United States v. Dakota Wayne Campus*, No. No. 22-

CR-0064-CVE, 2022 WL 3756512, at *4 (Aug. 30, 2022) (limiting Ms.

11

Gonzalez's testimony to the relevant facts of the case). As limited, the risk of unfair prejudice does not substantially outweigh the probative value of Ms. Gonzalez's testimony.

The Court further finds that her proffered testimony will not vouch for R.F.'s credibility. As a "blind" expert, Ms. Gonzalez will not base her expert testimony on R.F.'s account alone, or testify that, in her professional opinion, R.F. is telling the truth. *See United States v. Walker*, 85 F.4th 973, 988 (10th Cir. 2023) (reviewing other expert vouching cases).

## B. The statements Phetsacksith made to officers before he was in custody and the spontaneous statements he made while in custody are admissible.

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). But "*Miranda* warnings are required only at the moment the suspect is in custody and the questioning meets the legal definition of interrogation." *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020) (citation, brackets, and internal quotation marks omitted). "An interrogation is custodial when, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (citation

and internal quotation marks omitted). "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Jones*, 523 F.3d 1235, 1240 (quotation omitted). Courts should consider: "(1) the extent ... the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will, (2) the nature of the questioning, (3) the extent police officers dominate the encounter," and "(4) the release of the suspect at the end of the questioning." *Wagner*, 951 F.3d at 1250 (cleaned up). "Officers may 'dominate' an encounter by displaying a weapon, making physical contact, isolating the suspect in a police-controlled environment, or appearing in overwhelming numbers." *Id.* (citation omitted).

Only when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest'" is he "in custody" for *Miranda* purposes. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). An officer's subjective plan "has no bearing on the question [of] whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442 (citations omitted).

Phetsacksith argues that all the statements he made the night of his arrest should be suppressed because he did not receive *Miranda* warnings. [ECF No. 39 at 6]. The government responds that statements Phetsacksith

13

made before he was placed in custody and those he made while in custody that were not in response to "direct questioning" are admissible. [ECF No. 44 at 8–14]. The government concedes that statements Phetsacksith made after he was handcuffed that were in response to Shipman's direct questions about "the assault's location, the nature of his relationship with R.F., and his tribal affiliation" are not admissible. [*Id.* at 12]. However, the government contends that Phetsacksith's confession in response to a "clarifying question" posed by Shipman is admissible. [*Id.* at 13].

Phetsacksith correctly concludes that he was placed in custody when Shipman handcuffed him. [ECF No. 39 at 5]. Therefore, the Court finds that Phetsacksith was not "in custody"—and therefore not entitled to *Miranda* warnings—until he was handcuffed. Before this point, officers had not made any physical contact with Phetsacksith and, in fact, left him alone in the parking lot minutes earlier while they met in the ambulance. Although the officers did not tell Phetsacksith that he was free to leave or tell him that he did not have to answer questions, they questioned him for under 10 minutes before placing him in handcuffs. And the tone of the entire interaction was pleasant and non-threatening. With only two officers present, the atmosphere was also not police-dominated. *Cf. Wagner*, 951 F.3d at 1251 (finding encounter not police-dominated when six agents were present but only two interviewed the defendant).

Phetsacksith argued at the pretrial hearing that an evidentiary hearing was required so the Court could determine when he subjectively believed he was "in custody" for *Miranda* purposes. But Phetsacksith's subjective belief is not the determinative factor. "[A]n objective, reasonable-man test is appropriate because, unlike a subjective test, it is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question." *Berkemer*, 468 U.S. at 442 n.35 (citation omitted). Although evidentiary hearings are frequently held on motions to suppress, a hearing is not always required. *See United States v. Glass*, 128 F.3d 1398, 1408–09 (10th Cir. 1997) ("[A]n evidentiary hearing is only required when the motion to suppress raises factual allegations that are sufficiently definite, specific, detailed, and nonconjectural …." (cleaned up)). Because there are no disputed facts that need to be resolved by considering evidence outside the body camera footage, an evidentiary hearing on Phetsacksith's motion is unnecessary.

In sum, the totality of the circumstances convinces the Court that Phetsacksith was not in custody before Shipman placed him in handcuffs. Before this point a reasonable person in Phetsacksith's position would not have understood their situation as "the functional equivalent of formal arrest." *United States v. Cortez*, 965 F.3d 827, 840 (10th Cir. 2020) (quotation

15

omitted). *Miranda* warnings are not required when a suspect is not in custody; therefore, all the statements Phetsacksith made before he was handcuffed will not be suppressed.

But the statements the government concedes were made in violation of *Miranda* will be suppressed, as well as Phetsacksith's confession to Shipman after he had been taken into custody.[3] The government argues that Phetsacksith's response to Shipman's statement, "So, you said you guys were drinking, arguing, things got a little out of hand, so …" should not be suppressed because the statement was not interrogation for *Miranda* purposes. [ECF No. 44 at 12–13]. The government portrays Shipman's statement as "a clarifying question," that was "sought to confirm Phetsacksith's understanding of events." [*Id*. at 13]. But the Court is unpersuaded. "[I]nterrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The Court finds that Shipman should have known his statement was reasonably likely to elicit (and did, in fact, elicit) Phetsacksith's confession. Because

---

[3] The *Miranda* exclusionary rule requires only that the Court exclude any "unwarned statement" itself. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

Phetsacksith's response to this statement was made in violation of *Miranda*, it will be suppressed.

However, the spontaneous statements Phetsacksith made while in custody will not be suppressed. These statements were made voluntarily and not in response to questioning.[4] Spontaneous statements not made in response to interrogation are admissible even without a *Miranda* warning. *United States v. Pettigrew*, 468 F.3d 626, 633–34 (10th Cir. 2006) (citations omitted).

## III. Conclusion

As explained above, the Court finds that Ms. Gonzalez's proffered expert testimony is reliable but must be limited to the facts presented in this case. For the motion to suppress, the statements Phetsacksith made before being placed in handcuffs and the spontaneous statements he made while in custody are not subject to *Miranda* protections; therefore, these statements are not suppressed. However, statements he made in response to custodial interrogation are suppressed.

**IT IS THEREFORE ORDERED** that the Defendant's Objection to Government's Notice of Intent to Introduce Testimony Pursuant to Rule 16(a)(1)(G) [ECF No. 36] is **OVERRULED**, in part, and **SUSTAINED**, in part, consistent with this Order.

---

[4] Phetsacksith does not challenge the voluntariness of his statements.

17

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress [ECF No. 39] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Order.

DATED this 22nd day of December, 2025.

_Sara Hill_
Sara E. Hill
UNITED STATES DISTRICT JUDGE

18